We'll hear the next case on the calendar, Jander v. Retirement Plans Committee. Thank you. May it please the Court, my name is Sam Bonderoff and I'm here on behalf of the Plaintiff Appellant Larry Jander and Richard Waxman, current and former employees of IBM, who have alleged breach of fiduciary duty against the ERISA fiduciaries of their company IBM. This case is about how to apply correctly the holding of Fifth Third Bancorp v. Dudenhofer. And that case has a very, most of that case is concerned with one particular holding that has gotten lost in a lot of the jurisprudence that's come since. But that holding should be central to any analysis of how to apply that case. And that holding is this. Fiduciaries of an employee stock plan are subject to the same duty of prudence as all other ERISA fiduciaries. The only exception to that is that they don't have to diversify their investments. Other than that, they are to be treated like any other ERISA fiduciary, subject to the same duty of prudence. There's no special dispensation for them. The munch presumption of prudence that was overruled in that case carved out a special pleading exception for ESOP fiduciaries. And the Supreme Court said, no, that is incorrect. It is inconsistent with the statute. So how do we assess the adequacy of alternative actions that Fifth CERT Bancorp requires a plaintiff to plead in order to state a duty of prudence claim against an ESOP fiduciary? In other words, if we were to find that generic allegations are adequate, then how do we separate the wheat from the chaff? Well, Your Honor, the way to separate the wheat from the chaff is to consider the more harm than good standard, which I think is what Your Honor is getting at, in the context of the larger ERISA duty of prudence. So the question is, if I am an ERISA fiduciary, if I'm an ESOP fiduciary, and I have reason to suspect that the investment I'm charged with monitoring has become imprudent, that is artificially inflated in value, then the more harm than good standard asks us to consider, you know, what alternative action could I have taken and would it have done more harm than good? The distinction comes not from, the distinction comes from their use of the word negative information, which I think is how they're using it to fit into the larger rubric of duty of prudence cases. So there are two examples I think that are illustrative here. The Retirement Committee of IBM, which is the ESOP fiduciary here, had a fourth member who is a Senior Vice President of Human Resources. That person is not a defendant in this case, and here's why. If you're a Vice President of Human Resources and you become aware of the possibility of negative information that might mean that IBM's stock price is being traded at an artificially inflated value. Maybe an employee comes to you, a whistleblower internally, and says, I think that the microelectronics business is impaired and it's not being written down and that's inflating the stock price, it's material, we need to do something about it. Well, if you're the Senior Vice President of Human Resources, that does not mean that you have an obligation automatically to go and act on that. In any other ERISA context, we'd look at something like that and we'd say, oh, that's a red flag, and an ERISA fiduciary needs to investigate a red flag to determine whether this is actually something you need to act on or not. So in that case, Dudenhofer asks that fiduciary to say, okay, I know that there might be imprudence in this investment, would it do more harm than good to make a disclosure right now? Well, it might, because all you have is a red flag. You don't have confirmation. You don't know that you have an impaired business. You don't know that you have an imprudent investment. You only have the possibility of one. So are you saying that there's a dividing line between cases that allege that fraud should have been investigated and cases where the fiduciaries already knew or should have known about an existing fraud? It is exactly that. Okay, so help me understand this. So your argument is that a premature disclosure of potential fraud could artificially lower the stock price if there is really no fraud, but that in an efficient market, disclosure of the actual fraud would never do more harm than good. Is that correct? That is correct, Your Honor, because as even cases cited by the appellees say, the way the efficient market works, the amount that it's going to go down when you disclose the actual fraud is about the same whether you do it now or you do it six months from now. So are you saying that any complaint that alleges that the fiduciaries knew about a fraud would succeed on a motion to dismiss because disclosure is always a preferred option? Are you saying that? We are, Your Honor, because in those cases, the hard work that Dudenhofer asks you to do of making specific allegations would have been made. They would have been made in showing that there was artificial inflation and that it was known by the fiduciaries. That's the context-specific pleading that gets the plausible sheep separated from the meritless goats. How does that comport with this context-specific case-by-case analysis? That would be exactly where the context-specific analysis would occur. It would occur in determining whether there is an allegation of a known fraud or one that merely is suspected and needs to be investigated. Because if you look at it through the other lens, if you say that the context-specific allegations need to be made about, okay, now I'm a fiduciary, I know there's fraud, now what do I do about it? Not only are you signing on to a world where fiduciaries are allowed to know about a fraud and indeed participate in it and perpetuate it without doing anything, but you're also making it impossible to plead those claims because you'll never be able to say that a fiduciary wouldn't have to be worried about a stock price drop that's going to occur when you correct a fraud. That's inherent in the nature of artificial inflation of stock. There will be a stock price drop when you correct it. And what the district court and the appellees are arguing for is a situation where that standard means just the fear of that stock price drop, even if there's a fraud going on, is enough to make you say, I don't have to do anything. And if you as a fiduciary don't have to do anything, then you're not being subject to the same duty of prudence as other ERISA fiduciaries. You have immunity. And that is exactly what Dudenhofer said should not be the outcome. Let me ask you a question that is aimed at making sure I understand your point there. The fiduciary in your case would know that selling the stock is going to result in a market fall. Right? He knows there's a fraud. He's going to sell the stock because it's going to go down. It's going to result in a market fall. Okay. What he doesn't know is whether if he holds and doesn't act now, down the road when the fraud becomes known, the company's position in other ways is more advantageous so that the disclosure down the road may not result in as great a fall as it does now. And so in that sense, what he doesn't know is the context of now versus later. And why isn't that a reason to think that it's not necessarily doing less harm than good to disclose it immediately? Well, Your Honor, there are a lot of things that the fiduciary in that position wouldn't know for sure. And it is a longstanding principle that we don't judge ERISA fiduciaries with hindsight, with the benefit of hindsight. We judge them based on what they knew at the time. But what I'm saying to you now is what he doesn't know is whether down the road the disclosure may be less harmful. Your Honor, that would be an exception that would swallow the rule. Because if that's true, if any fiduciary can always say, I don't know for sure that the company won't be in a better situation to handle this announcement of fraud six months or a year from now, then a fiduciary will always be off the hook for not doing anything because they never know what's going to happen. If we assume your fiduciary here, you say, was complicit in the fraud. But if we assume a fiduciary who's not complicit in the fraud but learns that there may have been some cooking of the books on something, is he obliged to sell immediately? Is he obliged to stop buying immediately? Your Honor, we would not say that, first of all, they're never obliged to sell based on that information. That would be insider trading. They would be obliged to make a corrective disclosure. Not for the fiduciary who, well, never mind. Okay, I'll give you your insider trading concern. Go ahead. We would say that the fiduciary would be obliged to make a corrective disclosure as soon as the security laws permit. We're not trying to set up a situation where you're making interim disclosures and going beyond what the securities laws require. The fiduciary in that situation doesn't know a lot for sure, but they know two things that are almost certain. One thing they know for sure is that as time passes, more and more people are going to buy at the inflated price, more and more plan participants. You don't know whether they will be a net seller or a net buyer at the end of all of this because you can't see the future. But you know that every day that passes, more and more of the people you owe your duty to are buying at the price. That's a guarantee. So the longer you wait to disclose, the more of that happens. That harm is going up. You also know, based on the history of securities laws and common sense, that the longer a company defrauds the public, the more likely the company is going to get punished by the public when it comes clean. Let's deal with that disclosure. The non-insider fiduciary learns that the books may have been cooked. Are you saying he has an obligation to make a public disclosure of that? That's going to adversely affect the holdings of the beneficiaries. Why would he have an obligation to disclose? We wouldn't say that he has to make the disclosure himself. Our argument for the fiduciary who is not like the fiduciaries here, the CFO and the general counsel and the chief accounting officer, we would say that in that case they should try to get the disclosure made through the mechanisms provided by the federal securities laws. Why? It's not the circumstances. You see, I'm probing these questions because it occurs to me that the problem here is these folks' failure to meet their obligations under the securities laws, not necessarily under ERISA. So that's why I'm asking you why a non-insider fiduciary who learned that there was a valuation of a company asset would have an obligation to his beneficiaries to get that information out to the public. For two reasons. One, because if he doesn't, then more and more of the people he owes that duty to are going to be buying at those inflated prices. And two, because he knows that — That's separate because one of the things you say is that they should have stopped buying. We don't say that in our — I'm sorry. You don't take — you don't pursue that? We're on appeal. We are not alleging that as an alternative action on appeal. On appeal, our only alleged alternative action is corrective disclosure. And the circumstances here are different than a lot of other cases because here you have the employees as the fiduciaries who are in a position to make that corrective disclosure. Yeah, but you see, again, this may be very simplistic, but if your clients are holding stock valued at $100, when that disclosure goes out, I think even you agree it's going to go down, go down to $75. How does it benefit them at all to get the disclosure made? Well, Your Honor, if there is a corporate fraud going on, they have no evidence at that time that if they wait a year, it's going to go down to $90 instead of $75 or $95 instead of $75. In fact, what the efficient markets tell us is that the fraud, all things being equal, whether you disclose now or in a year from now, it's going to go down about to $75. The question— The problem was that the fiduciary, if he sells upon learning that, may have an insider trading problem, but not if he holds. In any event, thank you for trying to answer my question. Thank you, Your Honor. May it please the Court. Lawrence Portnoy, Davis Polk & Wardwell for the Defendant Appellees. The Chief Judge started with the question, well, how do you separate the wheat from the chaff? And the Supreme Court answered that question exactly in Dudenhofer. In Dudenhofer, the Supreme Court recognized that there is this class of cases, these stock drop ERISA cases, and they create a potential for abuse. The abusive stock drop case in the securities litigation context has to go through the PSLRA, the Private Securities Litigation Reform Act, the hurdles there. The PSLRA does not apply to ERISA claims, and so what the court was reacting to was the same kind of abuses we had seen in securities class actions being imported into ERISA class actions. And so the debate for years had been, how does one deal with that question? How does one separate the wheat and the chaff, the sheep and the goats, in the words of the Supreme Court? And what the Supreme Court did was itself tackle that question and give instruction to the lower courts on exactly what analysis to undertake to determine whether it's a sheep or a goat. And what the Supreme Court said was . . . You're rejecting the presumption of prudence, right? That's correct. The Supreme Court said we're rejecting what many courts had said was a rejection of prudence, which I think had been a way to try to separate. So this court said we're not accepting of the notion that there is any presumption of prudence here. That's not found in the statute. But nonetheless, there needs to be a way to examine cases like this to determine whether they should proceed to discovery, whether they should survive a motion to dismiss. And the Supreme Court, it's in Dudenhofer, and then it was reaffirmed by the Supreme Court in Amgen a short time later. What the Supreme Court says . . . Amgen, it's hard to know what Amgen actually says. I mean, it's . . . Except that it was a clear reversal of the Ninth Circuit, which would have permitted the case to go forward based on the Ninth Circuit's then reading and I think narrowing of Dudenhofer. But . . . So the court does say that there may have been something to it, but it wasn't developed. Fair enough, and was not developed, and the case was dismissed after Supreme Court review. But what the Supreme Court did, the Supreme Court spoke quite clearly, and the Supreme Court said an ERISA plaintiff must come forward and allege an alternative course of conduct that would have been better, number one, and also that they must allege that the fiduciaries could not have concluded that the course of action would not do more harm than good. So a fiduciary faced with these facts has to be alleged to have been unable to conclude that the proposed course of action would have not caused more harm than good. But in this case, that analysis, and Judge Pauly went through that analysis in detail, that analysis I think compels a conclusion that in fact the disclosure . . . the plaintiff's appellants argued a variety of alternative actions below. We're now down to one disclosure. It seems though that, and help me understand this, that what the district court did was come pretty close to adopting the standard in Whitley, and the Whitley standard seems to be higher than the standard that you've just articulated in Dudenhofer. Well, irrespective of . . . In other words, what I'm thinking is, what I'm wondering is whether what the district court did was something that the Supreme Court in Dudenhofer was trying to say you can't do. Yeah. I certainly would not accept that as being what the district court did here. I think the court referred to the Dudenhofer standard. The court, I believe on its face, sought to apply the Dudenhofer standard. But perhaps more importantly for purposes of this appeal, if you look at the allegations of the complaint, and this court applies the allegations in the complaint to the Dudenhofer screen, I think the case can't go forward. And why is that? I think the difference that the defendants here are charged not simply with the risks of violations, but with basically being the actors who perpetrated the fraud. There's some disquiet, perhaps, in thinking that you can fraudulently manipulate the stock price by overvaluing an asset and then still act as a fiduciary in buying and selling that stock for employee beneficiaries. What am I missing here? I think what that misses, Your Honor, is that there is, and Your Honor knows this well, there is a whole library of our law, a whole collection of our statutes, which go to securities regulation, enforcement, disclosure issues, all of that. If there were a securities law problem here, if there were a fraud, if there were allegations sufficient to establish a fraud. The claim on that went out on Center Film. Exactly right. I understand that. But it's important. We have a securities fraud claim companion to this, the same allegations that do not survive a motion to dismiss. There's no allegation of an SEC investigation. There's no allegation of any sort of law enforcement investigation. There's no allegation that anyone in the business press or analysts accused IBM of fraud. So what we have here is the only person asserting that IBM committed any fraud or those individuals committed any fraud is here under the cloak of an ERISA claim. That's a fundamental problem, and I think that creates the need to separate the sheep and the goats. So when my colleague says, I mean, the problem is if cases like this gets dismissed, fiduciaries are allowed to perpetrate securities law violations. They're allowed to perpetrate the fraud. Not at all. They must act within the strictures and confines of the securities laws, and they are subject to the penalties of the securities laws if they do wrong. That's very different than saying an ERISA plaintiff can come forward and say, aha, you violated the securities laws, therefore you breached your duty of prudence. Are you saying that basically on this complaint, even though we have to read everything in the light most favorable to the plaintiff, the one thing we don't read most favorably to them is the claim that your clients violated the securities laws? I think you can accept as true those allegations. You can or cannot? You can accept as true those allegations. It's a motion to dismiss. Judge Pauly accepted those allegations as true. We dispute them. We don't think even what they've alleged constitutes a securities fraud. But put that aside. Assume for purposes of this argument there is a fraud. That still leaves the court with the question of what were these fiduciaries to do when confronted with the plan they had, which was filled up with IBM stock, the plan they had, which had far more sellers than buyers because there was a lot more selling activity than there was buying activity. What were these fiduciaries supposed to do when they learned of that fraud, again, assuming it was a fraud? Now, if you or I or anyone else is a fiduciary sitting in that chair and we're asked the question, will our fund be better off if we make this disclosure or we don't make this disclosure, I think the answer in this case on these allegations is clear. The fund is better off if we don't make that disclosure. Why is that? Because the fund contains stock. The value of that stock would immediately be harmed if the disclosure was made. We have many of our plan participants who are actively selling stock. People tend to buy or sell stock in these ESOPs depending on their age. And if we have an older population, there's going to be more selling than buying. The evidence is undisputed here that this was a population that was selling, not buying. That population would have been harmed by early disclosure, earlier disclosure, because they would have gotten less for their shares. Now, yes, are those buying shares? Are they paying more? Perhaps. But as a fiduciary, you have to look at the fund as a whole. When you say perhaps, is there any doubt? Well, are we talking real world or are we talking the allegations and the complaint? The allegations and the complaint is there was a fraud. The fraud inflated the price of the stock, and, therefore, there would be no doubt. In anything which approximates the real world, there's substantial doubt. There's substantial doubt that any of this, any of the write-down of the microelectronics assets, had anything to do with the drop in share price, that the disclosure about the microelectronics write-down was on the same day as a very poor earnings announcement. Plaintiffs jumped to the conclusion, they assume, that they allege, that the drop in share price was due to the write-down of the assets. I don't think that is an allegation that the court could or should credit. Now, Judge Pauly did for purposes of this motion, but I think there is a substantial question that there was any diminution of the share price because of the microelectronics write-down that plaintiffs make as the focus of their complaint. My question to you, perhaps not put artfully, was, though, to suggest that so much turns on whether there's a plausible securities pleading here because I think an argument could be made that your client simply cannot act as a proper fiduciary if it was buying and selling stock on behalf of beneficiaries, knowing that the stock was valued fraudulently. I mean, when you just said that the population of this plan would be selling stock, your failure to disclose if you are the insider who has perpetrated the fraud is to advantage those beneficiaries over the market as a whole, so you expose yourselves to securities claims. On the other hand, the plaintiff is charging you with other violations. In short, if your client is responsible for the overvaluation, how can you possibly act as a prudent fiduciary? And my subsequent question to that would be, why should we hear that your client has perpetrated a securities fraud when the securities fraud claim has been thrown out against you? But you just told me in response to my question that I could assume your client perpetrated the fraud. Well, as a pleading matter, that is what they allege. I think you do have to look at the underlying factual allegations and the strength of those factual allegations. But even if you assume the fraud under the Dudenhofer standard, the case must be dismissed. And the case must be dismissed because Dudenhofer instructs to look at what the fiduciaries are doing and the fiduciaries are faced with at a moment in time. And at that moment in time, if the fiduciaries had made a determination to make the disclosure, which is the only course of action as alleged, that would have hurt the fund. That would have been acting in a way that is not consistent with the duty of prudence. So what plaintiffs are alleging, what plaintiffs are asking for, is that the securities law backdrop should require these fiduciaries to act in a way which is inconsistent with their ERISA fiduciary duties. Dudenhofer solves this problem. Dudenhofer solves this conundrum by saying you have to look at it through the lens of the fiduciary and you have to identify, you have to allege that there was a better course of action for the fiduciary to proceed, a better course of action for the fiduciary, more protective of the fund, and that the fiduciary could not have concluded that there would have come more harm to the fund than benefit to the fund if they did it. On these facts, where you have a stock plan that's filled with stock and when people are actively selling, the plaintiffs cannot possibly meet that standard. I gather that Dudenhofer and the cases that follow simply take the fiduciary out of a lose-lose situation. That is, it takes them out of a place where they're damned if they do. And they may be damned, but they're not damned under this statutory scheme. I think that's a more than fair observation, Your Honor. I think what I would add to that is that damned if you do, damned if you don't situation is created by the structure of the ERISA statute and the fact that the ERISA statute encourages employee stock ownership plans, which are sponsored by and the fiduciaries are provided by the issuer of the securities. It puts them in that position or encourages them to get into that position. That's correct. And I think the Supreme Court recognized that and the Supreme Court jurisprudence and jurisprudence leading up to it and jurisprudence following it recognized that there needs to be a solution. The solution that we have now is the standard in Dudenhofer, and it's also the standard in this circuit. And if you apply that standard, the dismissal should be affirmed. I recognize that the fiduciaries in Dudenhofer were insiders, but I didn't recall that they are supposed to have been the people who signed off on the fraud the way your clients are alleged to have been. Is that right? That's an entirely fair point, Your Honor. And just a moment on what the alleged fraud is. The alleged fraud is the failure or the delay in writing down the value of physical assets. What physical assets? Fabrication plants for microchips. But the valuation, again, according to the plaintiff, is that you were giving it a significant valuation when in the end you had to pay people to take it off your hands. Yes, and that is the allegation. But just to back up on how that valuation works, the microelectronics business or the microelectronics assets were used to create these microchips. The microchips were then used for IBM servers. So chips were produced. They're put in servers. Servers are then sold to the world. That server business was immensely profitable. If you look at the microelectronics manufacturing alone, it's not very profitable. It's very costly to make chips. There are competitors with more modern facilities, et cetera. So you have a bunch of assets which are alone unprofitable, but they are within a larger universe which creates a very profitable world-leading product. What does the accounting literature tell you about whether a write-down is necessary then? The accounting literature would say you group your assets essentially by the productive business. And these microelectronics assets were grouped within STG, the group that produced the servers. IBM made a judgment that as long as we are using these fabrication facilities, these physical assets, they are producing chips. We are using those chips. We are selling them in profitable servers. We do not have to go asset by asset and write down the assets, even if these fabrication facilities are old, they're out of date, they're going to be hard to sell. But let's get to the bottom line. The bottom line is that IBM would pay $1.5 billion to GlobalFoundries to take the business off of its hands, that IBM would be taking a $2.7 billion impairment charge in the stated value of the business for tax purposes. Isn't that correct? Well, that is correct, but that is in the context of a sale of the business. So when you sell the business, you have to do the analysis, the impairment analysis to write it down. IBM would say they did it at exactly the right time. And those numbers that you quote I think are a little misleading, Your Honor, because those numbers are in the context of this overall transaction with GlobalFoundries. The overall transaction with GlobalFoundries required GlobalFoundries to continue to produce those chips for IBM servers for the next 10 years and to use IBM technology and patents and all of that to do that. So, yes, there was a price to be paid, but there were substantial benefits for IBM in the transaction. When the disclosure was made, plaintiffs do allege that there was a stock drop, as I mentioned before. At that moment, there was a very negative earnings announcement. There is no one, I think, other than these plaintiffs and the dismissed securities plaintiffs, who are saying, aha, it was the write-down of the microelectronics assets, not the missed earnings that caused the stock drop. So we could delve into these facts. I, again, would suggest that I don't think one needs to under the Dudenhofer standard, but the facts here, I think, do not suggest that the write-down itself actually caused any harm to the plans or anyone else. So, this is all very helpful. Under what circumstances would someone prevail under Dudenhofer? In other words, your adversary says that what you're proposing, under what you propose, no one would prevail. And you have a response to that. Could you give it to me? Okay. Let's take the case of a company that's teetering on the brink of insolvency. And while they are teetering on the brink of insolvency, the company decides to set up an ESOP, charge fiduciaries with managing that ESOP. And they know that because it's a new ESOP, all it's going to be doing, and all it's going to be doing for its relatively young employees, is buying shares. There are no shares to sell. There are no shares in the ESOP whose value could be diminished by any disclosure or anything like that. That seems to me a case where a court could say there is a breach of the duty of prudence. Why at that moment were you opening up an ESOP for your employees? That is a breach of the duty of prudence. You could have given them 100 Fidelity funds they could have bought into, but you had to give them an ESOP in that circumstance. So that's an example, Your Honor, I think, of where the Dudenhoffer case law would permit a claim to go forward based on an ESOP, based on employee participation in an ESOP. That's one example. Thank you. Your Honors, I'll just make three brief points. The first is to deal with this issue of net selling versus net buyers. You cannot evaluate the conduct of an ERISA fiduciary with the benefit of hindsight, and the fact that the plan ended up being a net seller of stock during the class period is something you only know with hindsight. The Fifth Circuit just this week in Martone v. Robb held that in a case where the ESOP was a net buyer, that it shouldn't factor into the more harm than good analysis because it's not something you can know at the time. And it is not possible for the ESOP fiduciaries here to have known at the time whether there were more buyers than sellers. What they do know is that as time passes, there will be more buyers, and what they do know is that the risk of a flat stock price recovery increases the longer you perpetuate the artificial inflation. Point number two, the example offered by counsel for the appellee in response to Your Honors' question about what would pass the test under Dudenhofer was to offer a company on the brink of insolvency that creates an ESOP plan that is essentially a fraud on the people participating in it, putting aside the fact that there are other anti-fraud provisions in ERISA that would deal with that kind of action. Dudenhofer itself specifically says a plaintiff should not have to plead that a company is on the brink of insolvency before he can adequately state a claim for breach of the duty of prudence. That was the whole point of invalidating the Munch presumption, was that companies, you had to plead that the company was on the brink of insolvency. We can't now be in a situation where we've scrapped that presumption only to advance a different one that essentially ends up in the same place. In fact, we should be concerned about the fact that since Amgen, no case, not a one, has been able to survive a motion to dismiss that are pleaded, even with a variety of facts being pleaded. Yes, it is possible, but it is highly unlikely that every single ESOP is now simply always meeting their duty of prudence and that no plaintiff can possibly put forward a colorable claim anymore. The other possibility is that we should look at what most of the Dudenhofer opinion says, and most of what it says is hold them to the same standard you hold every other ERISA fiduciary. They don't get a special exception. Your Honor raised the issue of, you know, are they damned if they do and are they damned if they don't. That is always an issue for an ERISA fiduciary, whether they're dealing with an employee stock plan or not. There's always an issue with these cases that you're going to be second-guessing the judgments of fiduciaries. The question is, what did they do at the time with the information they had? Only in this context do we even ask ourselves, well, okay, there's an imprudent investment. We've established that in the complaint, but maybe the imprudence might be better for the plan participants than harmful to them. In any other ERISA context, if we were looking at an imprudent investment, we would say, once they know that there's an imprudent investment, they need to act. The question in every other ERISA case is always, did they know enough? Did they make the investigation that was necessary to find out if it was imprudent, and was it actually imprudent? If you can establish those things at the pleading stage, you get to move to discovery. I wanted to ask you, insofar as you plead that they not only knew that the stock was inflated, that they were responsible for its inflation, that they are the securities fraudsters, is it possible for parties who have inflated a stock to act as fiduciaries in the purchase or sale of that stock? We would argue that it is not, that that becomes a conflict, a clear conflict of interest. To the extent that that is the basis for your claim, how, if at all, do we factor in the dismissal of the securities claim against them? There are two different legal regimes with two different rights that are being vindicated and two different legal standards that apply. I understand that, but my point is, can we consider plausible your claim that they were securities fraudsters as a predicate for your ERISA claim, or, given the dismissal of that action, do we have to act as if it doesn't matter whether they did or did not? Indeed, we might have to presume that they did not engage in securities fraud and move forward from that position to take, to consider your ERISA claim. I ask that because I do have a difficulty understanding how a party that commits securities fraud with respect to the value of a stock can ever be a fiduciary in the purchase or sale of that stock. Well, Your Honor, we would actually say that it's closer to the latter example that you offered. So that's how you would urge us to look at this? Because what our allegation is that they knew or should have known that the stock was artificially inflated. As indeed on that sort of circumstance. Exactly. Okay. And so the standard is simply different for the pleadings. And finally, Your Honor, I just want to touch on that point. This is not securities law by other means. The Supreme Court has had many an opportunity to say that you should not be allowed to plead around the PSLRA by bringing a claim on behalf of employees. And they've never taken that opportunity, including in Dudenhofer. In no fact, it is clear that Congress put this in the statute for a reason. It is a separate right under the law of trusts. It is the highest duty known to law. And that has to still mean something to those employees. Thank you, Your Honors. Thank you both for your arguments. The Court will reserve decision. Thank you.